884 F.2d 580
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jon Thomas CUMMINS, Defendant-Appellant.
 No. 88-1811.
 United States Court of Appeals, Sixth Circuit.
 Aug. 28, 1989.
 
 Before NATHANIEL R. JONES, WELLFORD and RALPH B. GUY, Jr., Circuit Judges.
 PER CURIAM:
 
 
 1
 This case involves four different search and seizure issues raised initially in a suppression hearing before the district court. The defendant, Jon Cummins, was charged with various weapons and explosive charges, as well as intimidating a witness. He was acquitted of the intimidation charge, but convicted on all other counts. Prior to trial, defendant moved to suppress various items of evidence seized during a series of searches of a house, a motorcycle saddlebag, and a trailer. The searches of the house and the search of the trailer were pursuant to search warrants, while the search of the saddlebag was warrantless.
 
 
 2
 On May 28, 1987, a search warrant based upon information supplied by a confidential informant was issued for the residence located at 1711 James Street in Kalamazoo, Michigan.[1] Execution of the warrant was led by Lt. Charles McCord, a detective with the Michigan State Police.
 
 
 3
 After the residence was secured, McCord spoke with Darene Dean, Cummins' girlfriend, and the owner of the house. McCord read Dean the search warrant and the supporting affidavit authorizing him to seize all firearms in the house that were used for the protection of the occupants and their monies that were the result of narcotics trafficking. To McCord's surprise, Dean responded that she had a federal firearms license.
 
 
 4
 Based on Dean's information, McCord decided not to remove every gun in the house. Instead, he seized an AKS-7.62 mm semi-automatic rifle and several pistols, but left various rifles that were of a type generally used by hunters. He did, however, record the serial numbers of all guns located but not removed from the house.[2]
 
 
 5
 On June 5, 1987, a second search warrant was executed at the James Street residence by Sgt. Kenneth Colby of the Kalamazoo County Sheriff's Department. The warrant directed Colby to seize three rifles which officials had determined were stolen following a check of the serial numbers compiled during the May 28 search. In addition to the three rifles listed on the warrant, Colby also seized an AR-15 semi-automatic gun and a silencer.
 
 
 6
 On September 1, 1987, Cummins was arrested by the Kalamazoo County Sheriff's Department for driving under the influence. Because Cummins was also suspected of possessing explosives, Lynn Sheren, a special agent with the United States Department of Treasury, Bureau of Alcohol, Tobacco and Firearms, was called to the scene. Sheren had spoken with Cummins on two previous occasions, once questioning him about the AKS, the other time inquiring about the silencer seized on June 5, 1987.
 
 
 7
 Sheren contacted John and Nova Woodall, the parents of Darene Dean, and asked permission to enter their property in Comstock, Michigan, where Cummins maintained a trailer.[3] John Woodall consented, and accompanied Sheren to the property. Cummins' motorcycle was parked outside of the trailer, and there was a leather saddlebag on the rear of the motorcycle, which was partially open. At first, Sheren noticed a silver object in the bag. He then crouched down to get a better view, and recognized the object as a pipe bomb. Sheren did not touch the bag or the bomb.
 
 
 8
 Sheren also found another pipe bomb, a pipe attached to a trip wire (apparently designed as an "early warning" device), a rifle and a knife. Based upon these observations, Sheren obtained and executed a search warrant for the trailer. Inside, he found various fuses and a firearms conversion kit used to make an AR-15 fully automatic.
 
 
 9
 At the suppression hearing, Cummins argued, inter alia, that the handling of unremoved rifles and the recording of serial numbers therefrom by police during the May 28 search constituted an illegal search and seizure. He claimed also that the June 5 search warrant was invalid because it was based on information illegally obtained during the May 28 search. Finally, he challenged the seizure of the AKS rifle, and alleged that the warrantless search of the motorcycle saddlebag did not fall within the plain view exception to the fourth amendment warrant requirement. The district court rejected defendant's arguments on these issues, and we affirm.
 
 A. Recording Serial Numbers
 
 10
 The defendant argues that it was improper for the police to record serial numbers from guns not removed during the execution of the May 28, 1987 search warrant, which authorized seizure of "any and all firearms in the possession of the occupants." After Darene Dean informed Lt. McCord that she had a federal firearms license, he decided not to remove all guns located during the search of the residence. Instead the government seized only guns of the type usually associated with narcotics activities, and those of a sporting nature were not removed, the serial numbers of which were recorded. The district court held that moving and recording serial numbers from guns not taken did not constitute an unreasonable search and seizure.
 
 
 11
 The recent case of Arizona v. Hicks, 480 U.S. 321 (1987), involved an analogous situation, but the search occurred without a search warrant. Police officers, upon entering an apartment to search for a person who had fired a gun, found and seized three weapons and a stocking-cap mask. After locating these items, one officer noticed two sets of expensive stereo components, which seemed out of place in the ill-furnished apartment. Suspecting that the items were stolen, the officer read and recorded the serial numbers--moving some of the components in the process. He then called the numbers into his headquarters, was advised that some of the parts had been taken during an armed robbery, and immediately seized the items reported as stolen. It was later determined that other serial numbers matched those on additional stereo equipment taken during the same armed robbery, and a warrant was obtained and executed to seize that equipment as well. The defendant subsequently was convicted for the robbery.
 
 
 12
 The State argued in Hicks that the officer's actions constituted neither a "search" nor a "seizure" within the meaning of the Fourth Amendment. The Supreme Court held "that the mere recording of the serial numbers did not constitute a seizure" because "it did not 'meaningfully interfere' with [defendant's] possessory interest in either the serial numbers or the equipment." Id. at 324.
 
 
 13
 The moving of the equipment, however, "did constitute a 'search' separate and apart from the search for the shooter, victims, and weapons" that was the lawful objective of the policeman's entry into the apartment. Id. at 324-25. The Court explained:
 
 
 14
 Merely inspecting those parts of the turn-table that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of [defendant's] privacy interest. But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of [defendant's] privacy unjustified by the exigent circumstances that validated the entry.
 
 
 15
 Id. at 325 (citations omitted, emphasis added). The Court then concluded that the search was not valid under the "plain view" doctrine because the officer did not have probable cause to believe that the stereo components were evidence of a crime or were contraband. Id. at 326.
 
 
 16
 Hicks is distinguishable from the instant case in at least two important ways. First, in Hicks, the officers entered the premises without a warrant to look for a gunman, and the stereo equipment was totally unrelated to the purpose for which they lawfully entered. Here, the officers entered the residence under the authority of a search warrant directing them to seize any and all firearms of the occupants. Thus, the guns not removed from the house were not "unrelated to the objectives of the authorized intrusions." In fact, examination of all guns in the house was closely related to the objective of the authorized intrusion--to search for items associated with narcotics trafficking.[4] Under the Hicks rationale, recording the serial numbers constituted neither a "search" nor a "seizure" under the Fourth Amendment because the officers "[m]erely inspect[ed] those parts of the [guns] that came into view during the latter search." Id. at 325. Compare United States v. Gray, 484 F.2d 352, 355 (6th Cir.1973) (concluding that the recordation of serial numbers from guns located during a search for illegal intoxicants was improper because "there was no nexus between the rifles and the crimes of selling or possessing intoxicating liquor without a license; nor did the officers at the time have any knowledge that the rifles were evidence of any other crimes" (emphasis added)), cert. denied, 414 U.S. 1158 (1974). Here there was the necessary "nexus."
 
 
 17
 Second, in Hicks, the search of the stereo equipment occurred after the weapons had been located. In the instant case, the allegedly improper "search" occurred during the valid search for firearms related to narcotics operations. This difference in timing and circumstance is significant because the improper search in Hicks was "separate and apart" from the proper search. In this case, on the other hand, discovery of the unseized weapons in the instant case was integrally related to the "proper" search for narcotics-related firearms. There was no police action "separate and apart" from the lawful objective, and moving guns to record serial numbers did not "produce a new invasion of [defendant's] privacy unjustified by the ... circumstance[s] that validated the entry." See id. at 325.
 
 
 18
 We note additional supportive factors for the search in this case. First, the confidential informant stated that he saw both long guns and pistols during the controlled buy at 1711 James Street. The officers carrying out the search warrant would have been justified in removing even the long guns on May 28.[5] "It would be absurd to say that an object could be lawfully seized and taken from the premises, but could not be moved for closer examination." Hicks at 326. Second, some of the weapons involved were found in unusual locations within the house, or incriminated Cummins directly. Two of the three guns later discovered to be stolen, located behind a couch, and the third, although found in a gun cabinet, had a tag with Cummins' name on it. Cummins was a convicted felon whose right to possess a firearm had not been restored.[6] These factors indicate that the police had probable cause to move and examine every gun located in the residence.
 
 B. Good Faith Reliance
 
 19
 The defendant argues that the district court erred when it failed to quash the June 5, 1987 search warrant because the warrant was the result of "the illegal search of the serial numbers of various weapons" during the execution of the May 28, 1987 search warrant. As concluded above, the recordation of serial numbers did not constitute an illegal search. Even if we found that the officers did act improperly in moving the guns and recording the serial numbers, evidence seized pursuant to the June 5, 1987 warrant would not be suppressed because the officers conducting the search acted in good faith reliance on the validity of the warrant. See United States v. Leon, 468 U.S. 897 (1984), and United States v. Camona, 858 F.2d 66 (2d Cir.1988).
 
 
 20
 We therefore find no error in the district court's decision not to suppress evidence seized during the second search of the James Street residence.
 
 C. Seizure of the AKS Rifle
 
 21
 The defendant submits that the police improperly seized the AKS 7.62 mm semi-automatic rifle on May 28, 1987, because the seizure was not based upon the authority of the search warrant and there was no probable cause to believe that the rifle was evidence of a crime. The defendant's argument is not persuasive.
 
 
 22
 The warrant gave the officers the authority to seize any and all firearms of the occupants. AKS rifles, however, are very powerful and are favorites of those involved in narcotics trafficking. See also United States v. Arnott, 704 F.2d 322, 326 (6th Cir.) (recognizing that firearms are "tools of the trade" in the trafficking of narcotics), cert. denied, 464 U.S. 943 (1983). In addition, the location of the gun--under the kitchen table near some ammunition--was suspicious. Given these circumstances, we find no error in the district court's decision that seizure of the AKS rifle fell within the scope of the search warrant.
 
 
 23
 Police inspection of the AKS rifle, moreover, revealed "some brazing or welding," indicating that the gun may have been altered to fire fully automatically.[7] Because this type of modification is illegal, the obvious signs of tampering certainly gave the officers probable cause to believe that the gun would be of evidentiary value.[8]
 
 
 24
 D. Warrantless Seizure of Pipe Bomb From Saddlebag
 
 
 25
 The defendant's final argument on appeal is that Agent Sheren's seizure of a pipe bomb from the saddlebag on defendant's motorcycle did not fall within the plain view exception to the warrant requirement. In Texas v. Brown, 460 U.S. 730, 737 (1983), a plurality of the United States Supreme Court recognized three requirements that must be met before the seizure of evidence may be justified under the plain view doctrine:
 
 
 26
 First, the police officer must lawfully make an "initial intrusion" or otherwise properly be in a position from which he can view a particular area. Second, the officer must discover incriminating evidence "inadvertently," which is to say, he may not "know in advance the location of [certain] evidence and intend to seize it," relying on the plain-view doctrine only as a pretext. Finally, it must be "immediately apparent" to the police that the items they observe may be evidence of a crime, contraband, or otherwise subject to seizure.
 
 
 27
 Here, the defendant concedes that Agent Sheren was properly in the vicinity of the trailer and motorcycle due to the Woodalls' consent. However, the defendant contends that the two other requirements were not met.
 
 
 28
 He first argues that Sheren's discovery of the pipe bomb was not "inadvertent" because Sheren admittedly went to the Woodalls' to look for evidence, including specifically of bombs, explosives, and weapons. "Inadvertent" in this context does not mean "unexpected":
 
 
 29
 We conclude ... that "inadvertence" in this context means that the police must be without probable cause to believe evidence would be discovered until they actually observe it in the course of an otherwise-justified search. There are many times when a police officer may "expect" to find evidence in a particular place, and that expectation may range from a weak hunch to a strong suspicion. However, the Fourth Amendment prohibits either a warrant to issue or a search based on such an expectation. Yet if in the course of an intrusion wholly authorized by another legitimate purpose, that hunch or suspicion is confirmed by an actual observation, the police are in precisely the same position as if they were taken wholly by surprise by the discovery. The same exigent circumstances exist, and no warrant could have been obtained before the discovery.
 
 
 30
 United States v. Hare, 589 F.2d 1291, 1294 (6th Cir.1979); see also United States v. Sanders, 631 F.2d 1309, 1314 (8th Cir.1980), cert. denied, 449 U.S. 1127 (1981); cf. Coolidge v. New Hampshire, 403 U.S. 443, 471 (1971) (the inadvertency requirement is not met when law enforcement officials "know in advance they will find "the evidence in plain view and intend to seize [it]" (emphasis added)).
 
 
 31
 When Agent Sheren entered the Woodalls' property, he had reason to believe that the defendant had shot at an aircraft earlier in the day and that the defendant possibly had some grenades or explosives. It is apparent, however, from Sheren's testimony that he did not know he would find the pipe bomb:
 
 
 32
 Q. What did you expect to see at the trailer?
 
 
 33
 SHEREN: I didn't know. I thought if, ah, if I could legally get on the property and look into his trailer I would do it.
 
 
 34
 .............................................................
 
 
 35
 ...................
 
 
 36
 * * *
 
 
 37
 Q. What did you expect you might see when you looked into the [partially open saddlebag]?
 
 
 38
 SHEREN: I had no expectations. Just--no preconceived ideas. I just looked into the saddle bag.
 
 
 39
 Sheren also indicated that he had no cause to believe that he would find a pipe bomb in Cummins' saddlebag or to obtain a warrant for a search of the trailer when he first entered the Woodalls' property. Since the district court found Sheren to be credible, we conclude that the discovery of the pipe bomb was inadvertent within the meaning of Coolidge.
 
 
 40
 The defendant also argues that the criminal nature of the pipe bomb was not "immediately apparent" because Sheren testified that he initially saw a shiny object and that he could not determine the object's incriminating characteristics until he "crouched down" to peer into the bag. In Texas v. Brown, 460 U.S. 730 (1983), a police officer who stopped the defendant's car at a routine checkpoint became suspicious that the defendant possessed narcotics. From his position beside the driver's window, the officer bent down at an angle to have a better view of the interior, and observed drugs in the car. The defendant argued that the officer's changing vantage points violated the third prong of the plain view doctrine. The Court, however, held that the officer's changing position to enhance observation did not invade any additional privacy right of the defendant and did not invalidate a seizure otherwise justified under the plain view doctrine.
 
 
 41
 Because Sheren was able to determine that the shiny object was a pipe bomb without further opening or touching the bag, we also conclude that the "immediately apparent" prong of the plain view doctrine was also satisfied. Although there may be some limitation on the manner in which a police officer may enhance his position for purposes of the plain view doctrine, the totality of circumstances in this case and, specifically, the discovery of additional bombs and weapons in the immediate vicinity of the pipe bomb in question, indicates that application of the plain view doctrine was appropriate.
 
 
 42
 Accordingly, we AFFIRM.
 
 
 
 [1]
 The investigation of the James Street residence began in January 1987, and focused on a man named Bobby Armstrong, who rented a room in the basement. A confidential informant reported that Armstrong was involved in the sale of controlled substances and in counterfeiting. On January 27, 1987, the informant made a "controlled buy" from Armstrong at the James Street residence. The informant, who died before the suppression hearing, reported that Cummins and a woman described as Cummins' wife were in the house at the time of the purchase. He also observed various firearms in the basement, which he believed belong to Armstrong
 
 
 [2]
 Cummins arrived during the execution of the warrant. McCord read Cummins the warrant and then interviewed Cummins outside for approximately 20 minutes. McCord read Cummins his Miranda rights, but Cummins agreed to answer questions. Cummins was not under arrest or in custody at this time
 
 
 [3]
 Cummins testified that he had lived in the trailer for approximately one week. He moved into the trailer after an attorney advised him that he should no longer reside with Dean
 
 
 [4]
 It is important to remember that this is a narcotics case, not an illegal firearms case in which the warrant designated that only certain guns be removed
 
 
 [5]
 We reject defendant's contention at oral argument that when the officers exercised their discretion and decided to limit the scope of the search warrant, the prosecution was thereby precluded from obtaining serial numbers
 
 
 [6]
 Cummins was convicted in 1973 for falsifying records needed to purchase a firearm
 
 
 [7]
 A gun conversion kit was found in the defendant's trailer during Agent Sheren's September 1, 1987 search
 
 
 [8]
 Agent Sheren testified that he spoke with Darene Dean about the AKS because a federal firearms license does not permit possession of automatic weapons